UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GARITT A. KONO, JR.,                                        Case No.: 05 CV 9843 (RMB)

                 Plaintiff,                      **FIRST AMENDED COMPLAINT**

   - against -                                            (Jury Trial Demanded)

BLOOMBERG L.P., MICHAEL CLANCY,
CAROLYNN FEDOR, ANTONY MICHELS
AND SUZANNE LAZARCHICK, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES
OF BLOOMBERG L.P.,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      COMES NOW Plaintiff, Garitt A. Kono (**"Kono"**), by and through counsel, The

Law Offices of Neal Brickman, located at 317 Madison Avenue, 21st Floor, New York, New

York, 10017, and as and for his complaint against defendants, Bloomberg L.P. (**"Bloomberg"**),

Carolynn Fedor (**"Fedor"**), Michael Clancy (**"Clancy"**), Antony Michels (**"Michels"**) and

Suzanne Lazarchick (**"Lazarchick"**), states and alleges as follows:

## NATURE OF THE ACTION

      1.    This is an action alleging several violations of the Family and Medical

Leave Act of 1993 (**"FMLA"**), 29 U.S.C. § 2601 *et seq.*, as well as disability discrimination, age

discrimination and retaliatory conduct under New York Executive Law § 296, and New York

City Administrative Code §§ 8-107 & 8-502, and a claim of common-law fraud. Kono alleges

that, while on authorized leave pursuant to the FMLA, he was replaced by a management insider,

demoted and stripped of most of his  responsibilities as the producer of a popular news radio

show. Kono claims that, upon his return from authorized FMLA leave, he was assigned the

menial, assistant-level position of "booker" despite being assured that he would continue in his position upon return from authorized leave.  Additionally, Kono alleges that his repeated requests to be restored his position were met with retaliatory acts including threats, harassment, false letters of reprimand, and drastic cuts in compensation.  Kono seeks compensatory and punitive damages, costs, relevant interest, and attorneys' fees for these violations.

## PARTIES

2.     Kono is an individual citizen of the United States residing at 120 Gallows Hill Road, Westfield, New Jersey 07090 and is an employee of Defendant Bloomberg.  Kono is forty-four (44) years old.

3.     Upon information and belief, Defendant Bloomberg is a Delaware Limited Partnership with its principal place of business located in New York City.  It is duly authorized to conduct business in the State of New York and subject to the laws and statutes thereof.

4.     Upon information and belief, at all times relevant hereto, Defendant Fedor served initially as Kono's "Bureau Chief" or "Broadcast Editor," and reported directly to Bloomberg's senior management.  In that capacity, Fedor qualifies as an "employer" under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because she could control the terms and conditions of Kono's employment, including, but not limited to, his compensation, the production of performance evaluations that determined discretionary bonuses and raises, the maintenance of employment records, scheduling, and the ability to hire and fire him.  Upon information and belief and, as set forth below, Fedor was replaced in 2004 by Defendant Clancy.

5.     Upon information and belief, at all times relevant hereto, defendant

2

Michael Clancy served initially as Kono's "Team Leader" and later as Kono's "Bureau Chief" or "Broadcast Editor"and reported directly to Bloomberg's senior management.  In that capacity, Clancy qualifies as an "employer" under New York Executive Law § 296, and New York City Administrative Code  §§ 8-107 and 8-502 because he could control the terms and conditions of Kono's employment, including, but not limited to his compensation, the production of performance evaluations that determined discretionary bonuses and raises, the maintenance of employment records, scheduling, and the ability to hire and fire him.

6.     Upon information and belief, at all times relevant hereto, Defendant Michels was one of Kono's direct supervisors or "Team Leaders," and reported to defendants Fedor and Clancy as well as to other managers within the Bloomberg organization.  In that capacity, Michels qualifies as an "employer" under New York Executive Law § 296, and New York City Administrative Code  §§ 8-107 and 8-502 because he could control the terms and conditions of Kono's employment, including, but not limited to, his compensation, the production of performance evaluations that determined discretionary bonuses and raises, the maintenance of employment records, scheduling, and the ability to hire and fire him.

7.     Upon information and belief, at all times relevant hereto, Defendant Lazarchick was and is a Bloomberg Human Resources manager who, among other things, was responsible for ensuring compliance with the Family and Medical Leave Act of 1993 ("FMLA"). In that capacity, Lazarchick qualifies as an "employer" under the FMLA because she controlled, in whole or in part, Kono's ability to take a leave of absence and return to his position. Additionally, Lazarchick conducted personnel investigations related to Kono's performance and reported those findings to senior management, participated in performance evaluation meetings,

produced and maintained employee records and conferred extensively with defendants Clancy, Fedor, Michels and others regarding Kono's position, his compensation and other benefits.  In that capacity, Lazarchick qualifies as an "employer" under New York Executive Law § 296, and New York City Administrative Code  §§ 8-107 and 8-502 because she could control the terms and conditions of Kono's employment, including, but not limited to, his compensation, the production of performance evaluations that determined discretionary bonuses and raises, the maintenance of employment records, scheduling, and the ability to hire and fire him.

### JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that the claims herein arise under the laws of the United States, and in particular under the FMLA, 29 U.S.C. §2601 *et seq.*

9.     Further, this Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states for purposes of diversity jurisdiction under 28 U.S.C. § 1332(c), and because the amount in controversy, exclusive of fees and costs, exceeds the sum of $75,000.00.

10.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Kono's State law claims for fraud as well as those claims arising under New York Executive Law § 296 and under the New York City Administrative Code §§ 8-107 and 8-502.

11.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because the defendant entity resides, for purposes of venue pursuant to 28 U.S.C. § 1391(c), in this judicial district and  because a substantial part of the of the events giving rise to the claims herein occurred in this judicial district.

4

12.    Section 107 of the FMLA permits Kono to proceed directly in this Court without resort to, or exhaustion of, administrative remedies.

## FACTUAL BACKGROUND

13.    As set forth further below, Bloomberg is a multi-media conglomerate which maintains its principal place of business in New York City. It specializes in the broadcast and dissemination of news and financial information by, *inter alia*, frequency AM 1130 (WBBR - New York, New York), transmitted throughout the New York City metropolitan area, thus directly availing itself of the laws of the State of New York and doing substantial business therein.[1]

14.    On or about March 1, 1993, Kono began working in the financial news division of Bloomberg Radio.

15.    During his first eight (8) years as a Bloomberg employee, Kono rose quickly in the ranks of the organization, earning consistent annual pay raises and performance-based bonuses (paid in the form of "equity equivalency certificates"), the combination of which increased Kono's compensation substantially.

16.    During the summer of 2000, Kono proposed producing an "after-the-close-of-market" news magazine in which Bloomberg anchors would interview field reporters, as well as outside guests, to discuss day-to-day trends in the market so as to provide a "sneak preview" into the following day's open. Initially, Bloomberg management dismissed the concept outright,

---

[1]To further strengthen its ties to the New York metropolitan area, and in an effort to enhance its New York market share, defendant Bloomberg L.P. touts its affiliation with New York City Mayor Michael Bloomberg in its advertising, and transacts business under a series of eponymous trade names, including, but not limited to, "Bloomberg News," "Bloomberg Radio," "Bloomberg.com" and "Bloomberg Television."

but later developed the concept under the name "Bloomberg Tomorrow Tonight" (hereinafter "BTT").

17.     In or about September of 2002, Kono was assigned a full-time position as BTT's Producer; in that capacity he was in charge of booking guests, writing content for the show, and managing all aspects of production single-handedly.

18.     At about the same time, Kono began to experience excruciating pain in his right foot and ankle due to a torn ligament in the right arch of his foot. The condition caused contortion of the right ankle when pressure was applied, making it extremely difficult for him to stand or walk. Kono's physician recommended reconstructive surgery, but Kono opted to postpone surgery in light of the responsibilities of his new position.

19.     The show was a resounding success. Plaintiff was able to attract and book guests such as former presidential candidate John Kerry, former SEC Chairman Harvey Pitt, and Senator Joseph Lieberman, among others. Kono received distinction for breaking various stories, including his orchestration of a telephone interview with Jeffrey Vanderbeek, in which Vanderbeek disclosed his plans to quit the executive board of Lehman Brothers, in favor of buying and running the New Jersey Devils.

20.     Kono's performance was reviewed annually, upon information and belief, as a matter of ordinary business practice.

21.     In his capacity as Producer of the BTT show, Kono was evaluated three times. The first evaluation (2002-2003) alternatively identifies Kono's position as that of "Radio producer" and "Bloomberg Tomorrow Tonight Producer"; while the second (2003-2004) evaluation identifies Kono's position specifically as "Producer: Bloomberg Tomorrow Tonight,

6

New York."

22.     In both the 2002-2003 and the 2003-2004 evaluations, Kono's performance was described in extremely favorable terms, and he was designated as a "level 2" employee, which, according to Bloomberg, is a superior rating owing to one whose "performance frequently exceeds expectations" for the 2003-2004 evaluation period. Defendant Michels was listed as one of the "team leaders" participating in the highly favorable 2003-2004 evaluation.

23.     But Kono could not postpone surgery forever. In or about **October** of 2003, after approximately eleven (11) years of employment without material interruption, Kono informed Bloomberg management that he needed to undergo reconstructive surgery to his right ankle. Through his direct supervisor and co-evaluator in the 2002-2003 and 2003-2004 evaluations, Cynthia Costas,[2] Kono communicated his need for surgery and related short-term disability leave.

24.     Management's knowledge of the surgery and requested leave is referenced and expounded upon in the 2003-2004 performance evaluation, where either Costas or defendant Michels writes that Kono "has begun training colleagues to fill his shoes while he is out, a process that should continue in the months ahead to **ensure that the show does not suffer declines in quality in Tony's absence.**"

25.     In or about November 2003, approximately one (1) month after Kono communicated his need for surgery, Bloomberg management began advertising for a replacement Producer for the BTT.

26.     Upon learning of the advertisement, Kono immediately confronted his

---

[2] Not a party to this action.

Team Leader, Cynthia Costas, demanding to know whether he was being replaced.  Cynthia

Costas informed Kono that Defendant Fedor had placed the advertisement, but insisted that Kono

should "not worry about it," that it was a "bureaucratic mistake," and that she would raise the

issue with the bureau chief, Defendant Fedor.

27.    The next day, Team Leader Costas returned with a message from

Defendant Fedor, instructing Kono not to worry about it, that the job "was his" and that Kono

was performing at a "high level."  Kono himself arranged to meet with Fedor.  Kono understood,

based on comments by Fedor, that the position being advertised for was intended to be that of an

assistant or helper, and not his job, as Kono was "doing the work of three people."

28.    Kono's fears, however,  were not completely assuaged in light of the

language of the advertisement, which, by its terms, described Kono's position, and seemed to

contradict Fedor's assertion that the advertisement was calculated to recruit a mere assistant.

29.    Kono raised the issue with Defendant Michels during the January 2004

evaluation, which was not actually completed until June of 2004.  Defendant Michels assured

Kono that the advertisement was some kind of "bureaucratic mistake" and that no candidate had

applied or been interviewed for the position.

30.    During the process of requesting authorized leave and disability benefits

from Bloomberg's Human Resources department, Kono consulted with Defendant Lazarchick,

who also informed Kono that he should not worry and that the FMLA guaranteed that he would

return to his position as Producer of the BTT show, provided that he take no more than 12 weeks

of medical leave.

31.    A week prior to surgery, on or about June 24, 2004, Kono consulted with a

8

senior managing editor of the station, Marty Schenker, and raised his concern about being replaced while on disability leave or during the period of rehabilitation prescribed by his physician. Schenker explicitly told Kono not to worry about the position; he reiterated that the advertisement was "a mistake."

32.     Upon information and belief, the advertisement was removed or allowed to lapse on the Bloomberg website and the internal employment database shortly thereafter.

33.     Kono reasonably relied on these numerous assurances by high-level managers, human resources personnel and other supervisory employees, and went ahead with his scheduled surgery.

34.     On or about July 1, 2004, Kono underwent reconstructive surgery to his right ankle. The procedure entailed the breaking of existing bone in order to facilitate reconstruction.

35.     Upon information and belief, the aforementioned advertisement was re-posted on the Bloomberg website on or about July 8, 2004, approximately one (1) week after Kono's reconstructive surgery.

36.     On or about July 14, 2004 a friend called Kono to report that the advertisement for Kono's job had been reposted on the Bloomberg website. On or about July 15, 2004, Kono was informed that another Bloomberg employee, William McColl, had been hired as producer.

37.     Panicked, Kono telephoned defendants Lazarchick and Michels who independently reassured Kono that, upon his return, he would continue in his position as producer. Kono understood the arrangement in light of Fedor's promises that she was not

advertising for his job.

38.     On or about September 7, 2004, Kono reported back to work, well within the twelve (12) weeks provided by the FMLA and Bloomberg policy.  Upon his return, he was told by McColl that McColl was the new producer of the BTT show and that McColl had been assigned the position by senior management without applying for it.

39.     Immediately, Kono discovered that his hours, duties, and responsibilities had been reduced substantially, that he had been stripped of all production duties, and that he had been demoted from Producer of BTT to McColl's assistant and a "booker."

40.     On or about September 12, 2004, Kono arranged to see Defendant Lazarchick who informed him that he **never** had been the Producer of BTT.  When pressed, she conceded that if Kono had been the producer, he merely was filling the position on a "temporary" basis.

41.     On or about September 14, 2004, Kono met with Defendants Lazarchick, Clancy and Michels to express outrage and disapproval at what had happened to his job. Defendant Clancy voiced concerns that replacing Kono while he was on medical leave had been "illegal." Defendant Michels volunteered that the matter had been handled "poorly."

42.     Approximately one month after the September 14, 2004 meeting, Kono met with Defendant Clancy, and again requested that Kono's former position be restored to him. Clancy threatened Kono, saying that if Kono would not accept the role that had been assigned him, then McColl would choose a new position for him, and "who knows what that might be."

43.     On or about October 22, 2004, Kono received a scathing letter of reprimand from Defendants Clancy and Michels.  For the first time, the letter purports to draw

the distinction between Kono's position, described in the letter as "Segment Producer," and Mr. McColl's position, which is described as *the* BTT Producer." The letter also accuses Kono, without any basis in reality, of insubordination, lack of professionalism, and failure to meet company standards.

44.    Compounding these retaliatory threats, on or about November 22, 2004, Kono received a derisive, derogatory and abusive e-mail message from McColl, addressing Kono as "Douche Bag" or "Douchie-Douche," and insulting his professional abilities. This is followed by a second message by McColl on November 24, 2004, implicating the possibility of sexual conduct between Kono and a female Bloomberg employee.

45.    On or about March 1, 2005, Kono was again evaluated, this time by Defendant Clancy and a team leader other than Cynthia Costas. For the first time, and without an legal, factual or reasonable basis, Kono was designated a "level 5" employee, defined by Bloomberg as functioning below the *minimum* company standards.

46.    Since the 2001-2002 pay period, the same time that Kono turned 40, Mr. Kono's base salary has remained static at the $70,000 annual rate, despite having increased by nearly 13% in each of the preceding nine (9) years of his employment with Bloomberg. The cessation of these regular and predictable salary increases occurred shortly after Kono crossed the threshold age of 40, despite his continued excellent performance reviews at the time.

47.    The number of equity equivalency certificates ("EECs") awarded to Mr. Kono also decreased by more than 32% percent in 2003-2004, despite excellent performance reviews during that time, directly after Kono told Bloomberg of his need for ankle surgery.

48.    Moreover, since Kono communicated his need for temporary disability

benefits and authorized medical leave, his supplementary income in the form of equity

equivalency certificates has been slashed by more than 50%.

49.     Defendant Bloomberg has informed Kono that he has not been issued any

EECs for the 2006-2007 period, thereby eliminating a vital and significant part of his

compensation, which effectively constitutes an immediate 24% reduction in pay as compared to

previous years.

## AS AND FOR A FIRST CAUSE OF ACTION
(Interference With Plaintiff's Right to Restoration In Violation of §§ 104 and 105 of the Family
and Medical Leave Act As Against Defendants Bloomberg L.P. and Lazarchick)

50.     Plaintiff repeats, reiterates and realleges each and every allegation set forth

in paragraphs "1" through "49" with the same force and effect as if fully set forth herein at

length.

51.     Defendants Bloomberg and Lazarchick are "employers"within the

meaning of § 101 of the FMLA.

52.     Plaintiff is an "eligible employee,"within the meaning of the FMLA,

having worked for Bloomberg in excess of 12 months and for the statutorily-mandated 1,250

hours.

53.     Plaintiff's reconstructive surgery qualifies as a "serious illness" in that it

involves inpatient hospitalization and/or continuing treatment.

54.     Plaintiff took a period of medical leave not exceeding twelve (12) weeks,

beginning on or about July 1, 2004, and ending on or about September 7, 2004, for purposes of

undergoing the surgery and receiving continuing treatment as a result thereof.

55.     Prior to taking said leave in July of 2004, Plaintiff held the position of

Producer of the Bloomberg Tomorrow Today Show, was fully qualified for the position, performed his duties at a level "frequently exceeding expectations" and single-handedly produced, wrote, edited, booked and managed the BTT show.

56.    While Plaintiff was on temporary disability leave pursuant to the FMLA, he was stripped of his position as Producer, demoted to a position equivalent to that of a production assistant and "booker" and suffered a sudden and drastic reduction in his compensation.

57.    As a direct result thereof, Plaintiff has suffered damages in the form of lost wages, salary, employment benefits, and other compensation.

58.    Plaintiff has suffered additional harm in that his demotion has damaged his professional reputation, diminished severely his opportunities for promotion or alternative employment, and dramatically decreased his marketability in the industry.

59.    Section 104 of the FMLA mandates that Plaintiff be restored to his previous position, while section 105 prohibits Defendant Bloomberg's actions to interfere with that right.

WHEREFORE, plaintiff respectfully demands judgment as against Defendant Bloomberg in an amount to be determined at trial, but in no event less than Six Hundred Thousand Dollars ($600,000.00) compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
(Discriminatory Retaliation in Violation of §105 of the Family and Medical Leave Act As Against Defendant Bloomberg L.P.)

13

60.   Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "59" with the same force and effect as if fully set forth herein at length.

61.   Defendant Bloomberg employed discrimination in the form of threats, insults, humiliation and decreased compensation in direct retaliation for and calculated to extinguish Plaintiff's opposition to his unlawful demotion and decrease in compensation.

62.   Section 105 of the FMLA prohibits retaliation for Plaintiff's opposition to Defendant's prohibited practices.

WHEREFORE, plaintiff respectfully demands judgment as against Defendant Bloomberg in an amount to be determined at trial, but in no event less than Six Hundred Thousand Dollars ($600,000.00) compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
(Disability Discrimination In Violation of New York Executive Law §296 and
New York City Administrative Code §§8-107 & 8-502 As Against All Defendants)

63.   Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "62" with the same force and effect as if fully set forth herein at length.

64.   Plaintiff suffered a disability within the meaning of § 296 of the Executive Law and §§ 8-107 and 8-502 of the New York Administrative Code in that his condition and subsequent treatment impaired a normal bodily function (i.e. use of his right foot, lower leg and ankle).

65.    Defendants engaged in a pattern of discrimination against Plaintiff because of his disability, including, but not limited to, demotion, harassment, reduction in pay, poor performance reviews and manufactured letters of reprimand.

66.    By reason of the acts of discrimination detailed herein, Defendants have violated New York Executive Law § 296 and New York City Administrative Code §§ 8-107 & 8-502, and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

67.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendant Bloomberg in an amount to be determined at trial, but in no event less than Six Hundred Thousand Dollars ($600,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Age Discrimination In Violation of New York Executive Law §296 and New York City Administrative Code §8-107 & 8-502 As Against Defendant Bloomberg L.P.)

68.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "67" with the same force and effect as if fully set forth herein at length.

69.    Plaintiff was over the age of Forty (40) when his annual compensation was dramatically reduced, without cause.

15

70.     Plaintiff's age was an impermissible factor in the decision to decrease his compensation.

71.     Similarly situated younger employees (i.e. those with equivalent job duties and similar performance reviews) did not experience a reduction comparable to that of Plaintiff.

72.     New York Executive Law §296 and New York Administrative Code §§ 8-107 and 8-502 prohibit discrimination on the basis of age.

73.     As a direct result of this discriminatory reduction in compensation, Plaintiff suffered injury and harm.

74.     Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendant Bloomberg in an amount to be determined at trial, but in no event less than Six Hundred Thousand Dollars ($600,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Retaliation In Violation of New York Executive Law §296 and
New York City Administrative Code §8-107 & 8-502 As Against All Defendants)

75.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "74" with the same force and effect as if fully set forth herein at length.

76.     Defendants engaged in acts of retaliation, including harassment, reduction

16

in pay, false poor performance reviews and manufactured letters of reprimand as a direct result of Plaintiff's opposition to, and complaints concerning, the age and disability discrimination that defendants perpetrated against him.

77.    New York Executive Law § 296 and New York City Administrative Code §§ 8-107 & 8-502 prohibit acts of retaliation in response to an employee's filing or communication of a complaint or charge of improper discrimination as Plaintiff did herein, and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

78.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendant Bloomberg in an amount to be determined at trial, but in no event less than Six Hundred Thousand Dollars ($600,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Common-Law Fraud As Against All Defendants)

79.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "78" with the same force and effect as if fully set forth herein at length.

80.    Defendants knowingly, actively and repeatedly misrepresented to Plaintiff

17

that he would be restored to his position as producer of the BTT upon returning from authorized FMLA leave.

81.     Defendants intended for Plaintiff to rely on these misrepresentations, which were calculated to lull the Plaintiff into a false sense of security, to accept a lesser position at a reduced rate of compensation and responsibility, and to replace Plaintiff during his medical leave with a displaced insider.

82.     Plaintiff reasonably relied on the representations of Defendants, in part based on their positions as superiors, managers and supervisors as well as the similarity and consistency of the representations.

83.     Had Plaintiff known that he was to be demoted and replaced while on leave, Plaintiff would have sought other employment in a similar capacity outside of Bloomberg, attempted to postpone the surgery for a longer period, or negotiated an appropriate position elsewhere in the company.

84.     As a direct result of these misrepresentations, and Plaintiff's reliance thereon, Plaintiff has suffered suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

85.     Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendant Bloomberg in an amount to be determined at trial, but in no event less than Six Hundred Thousand Dollars ($600,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000); the costs and

disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any

such other relief to Plaintiff as this Court deems just and proper.

     86.  Plaintiff hereby demands a jury trial of the facts and circumstances alleged

herein.

Dated: New York, New York
    February 2, 2006

                The Law Offices of Neal Brickman
                Neal Brickman (0874),
                Attorneys for Plaintiff Garitt Kono
                317 Madison Avenue - 21st Floor
                New York, New York 10017
                (212) 986-6840

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

GARITT A. KONO, JR,

              Plaintiff,        Case No. 05 CV 9843 (RMB)

      - against -

                        **AFFIDAVIT OF SERVICE**

BLOOMBERG L.P., MICHAEL CLANCY
CAROLYNN FEDOR, ANTONY MICHELS
AND SUZANNE LAZARCHICK,
INDIVIDUALLY AND IN THEIR OFFICIAL
CAPACITIES AS EMPLOYEES OF
BLOOMBERG L.P.,

             Defendants.

- - - - - - - - - - - - - - - x

STATE OF NEW YORK  }
                 } ss.:
COUNTY OF NEW YORK  }

      IDRIS MAHMOUD, being duly sworn, deposes and says that he is over the age of 18 years;

is not a party to this action and resides within the State of New York; and that on February 3, 2006 , he

served the within FIRST AMENDED COMPLAINT , upon attorney's for defendants, by placing a true

copy of the same in a postpaid wrapper in an official United States Post Office receptacle, duly addressed

as follows:

Tom Golden, Esq.
Willke Farr & Gallagher
787 7th Avenue, 45th Floor
New York, NY 10019
Attorney for Bloomberg L.P.

Scott M. Singer, Esq.
Davis & Gilbert
1740 Broadway
New York, NY 10019
Attorney for Carolynn Fedor

James R. Williams, Esq.
Jackson Lewis LLP
59 Maiden Lane
New York, NY 10038
Attorney for Suzanne Lazarchick

Harris G. Cogan, Esq.
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Attorney for Antony Michel

Jonathan G. Kortmansky, Esq
Sullivan & Worcester LLP
1290 6th Avenue
New York, NY 10104
Attorney for Michael Clancy

IDRIS MAHMOUD
LIC #1151131

Sworn to before me this
3rd day of February , 2006

NOTARY PUBLIC

DAVID M KEARNEY
Notary Public - State of New York
NO. 02KE6121530
Qualified in New York County
My Commission Expires _1-18-2009_